UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CHRISTIAN RUSU,

Plaintiff,

v.

Case No. 06-11730
Honorable Patrick J. Duggan

CITY OF BIRMINGHAM,
CITY OF BIRMINGHAM POLICE DEPARTMENT,
OFFICER JEFFERY WHIPPLE, OFFICER MARK CLEMENCE,
OFFICER SCOTT GREWE, OFFICER RYAN KEARNEY, and
OFFICER CHRISTOPHER KOCH,

Defendants.
_______________________________________/

**OPINION AND ORDER**

At a session of said Court, held in the U.S.
District Courthouse, Eastern District
of Michigan, on July 11, 2007.

PRESENT: THE HONORABLE PATRICK J. DUGGAN
U.S. DISTRICT COURT JUDGE

This lawsuit arises from an incident on June 3, 2005, when a third-party assaulted Plaintiff Christian Rusu while Mr. Rusu was in the custody of the City of Birmingham Police. In his complaint, Mr. Rusu alleges the following counts: (I) gross negligence; (II) violation of his rights under the Fourth and Fourteenth Amendments, pursuant to 42 U.S.C. § 1983; (III) conspiracy to deprive him of equal privileges and immunities and from discrimination in violation of the Fourteenth Amendment, pursuant to 42 U.S.C. § 1985; and (IV) violation of his rights under the Michigan Constitution.

Presently before the Court is Defendants' motion for summary judgment pursuant to Federal Rule of Civil Procedure 56(c), filed on April 13, 2007. The Court held a hearing on Defendants' motion on June 28, 2007. At the motion hearing, Mr. Rusu's counsel informed the Court that the only claim Mr. Rusu is pursuing at this stage in the litigation is his Section 1983 claim against the individual police officers for violation of his Fourteenth Amendment substantive due process rights. For the reasons set forth below, the Court grants Defendants' motion for summary judgment with respect to this claim. The Court dismisses Mr. Rusu's abandoned claims.[1]

## I. Standard for Summary Judgment

Summary judgment is appropriate only when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *See* FED. R. CIV. P. 56(c). The central inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52, 106 S. Ct. 2505, 2512 (1986). After adequate time for discovery and upon motion, Rule 56(c) mandates summary judgment against a party who fails to establish the existence of an element essential to that party's case and on which that party bears the burden of proof at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986).

[1] The Court, therefore, finds moot Defendants' request for involuntary dismissal pursuant to Federal Rule of Civil Procedure 37(b), based on Mr. Rusu's failure to comply with court orders, and for involuntary dismissal pursuant to Eastern District of Michigan Local Rule 41.2, for failure to prosecute. (Defs.' Reply at 3-4.)

The movant has an initial burden of showing "the absence of a genuine issue of material fact." *Id.* at 323. Once the movant meets this burden, the non-movant must come forward with specific facts showing that there is a genuine issue for trial. *See Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 1356 (1986). To demonstrate a genuine issue, the non-movant must present sufficient evidence upon which a jury could reasonably find for the non-movant; a "scintilla of evidence" is insufficient. *See Liberty Lobby*, 477 U.S. at 252, 106 S. Ct. at 2512.

The court must accept as true the non-movant's evidence and draw "all justifiable inferences" in the non-movant's favor. *See id.* at 255. The inquiry is whether the evidence presented is such that a jury applying the relevant evidentiary standard could "reasonably find for either the plaintiff or the defendant." *See id.*

## II. Factual and Procedural Background

On June 3, 2005, Mr. Rusu and some of his friends were at the Blue Martini Bar in Birmingham, Michigan. Mr. Rusu alleges that while he and his friends were dancing with some women, they were confronted by Johny Salmo and his friends. The groups exchanged words, at which time Mr. Salmo told Mr. Rusu that he would be waiting for him outside the bar. Mr. Rusu claims that when he left the bar, he was "jumped" by Mr. Salmo and his friends. Mr. Rusu then struck Mr. Salmo, causing a bleeding laceration on Mr. Salmo's forehead.

At approximately 2:30 a.m., Birmingham Police Officer Jeffery Whipple, responding to a fight in progress call, arrived at the scene. (Pl.'s Resp. Ex. 1.) Upon his

arrival, Officer Whipple noticed Mr. Salmo's still bleeding wound and asked him to describe what had occurred. (*Id.)* Mr. Salmo claimed that he and his friend were "jumped" by Mr. Rusu and his friends outside the bar. (*Id.)* Mr. Salmo told Officer Whipple that Mr. Rusu had struck him, causing his injury. (*Id.*) The Birmingham Fire Department was called to treat Mr. Salmo's laceration. (*Id.*) By this time, Birmingham Police Officers Christopher Koch, Scott Grewe, and Ryan Kearney and Sergeant Mark Clemence had arrived at the scene and started interviewing Mr. Rusu. (*Id.*)

In the meantime, while waiting for the fire department to arrive, Officer Whipple began treating Mr. Salmo's wound. (Pl.'s Resp. Ex. 1.) According to Officer Whipple's police report, Mr. Salmo told the officer to let him go so that he could go over and punch Mr. Rusu.[2] (*Id*.) Officer Whipple advised Mr. Salmo to calm down and that the police were taking care of the situation; however, he reports that Mr. Salmo was very adamant about striking Mr. Rusu. (*Id*.) An ambulance then arrived at the scene and Officer Whipple left Mr. Salmo in the care of the paramedics.

Officer Whipple then approached Mr. Rusu and the other officers. After hearing

---

[2] In his response brief, Mr. Rusu contends that Mr. Salmo was agitated and that at a specific time (2:31:19) on the recording of the incident, Mr. Salmo actually is seen pushing Officer Whipple. (Pl.'s Resp. at 4.) Plaintiff claims that the recording also captures Mr. Salmo's statements that he wants to hit Mr. Rusu at 2:32:30, 2:32:54, 2:33:17, and 2:33:52. (*Id*.)

Defendants have submitted as Exhibit 1 to their motion, a DVD containing footage taken at the scene, from the dashboard cameras of two different police cars. (Defs.' Mot. Ex. 1.) The DVD Defendants provide the Court begins at 2:42:58, sometime after the Fire Department's arrival (as the ambulance is seen in the recording when it starts) and Mr. Salmo's alleged acts of agitation. Plaintiff fails to provide the Court with the section of the footage on which he relies. Nevertheless, for purposes of deciding this motion, the Court will accept as true Mr. Rusu's description of what occurred before the footage in Exhibit 1 begins.

Mr. Rusu's version of the altercation and noting that Mr. Rusu showed no signs of injury, Officer Whipple placed Mr. Rusu under arrest. (Pl.'s Resp. Ex. 1.) Defendants claim that, in accordance with Birmingham Police Department policy, Officer Whipple walked Mr. Rusu to his patrol car in order to search him and transport him to the police station. Officer Whipple's patrol car was located a few feet from the ambulance in which Mr. Salmo was receiving treatment. (Defs.' Mot. Ex. 1.)

As Officer Whipple and Mr. Rusu approached the patrol car, Paul Struczul, apparently a friend of Mr. Rusu, came towards them and began to yell or speak to Officer Whipple.[3] Officer Whipple then steps between Mr. Struczul and Mr. Rusu, placing Mr. Rusu closer to the ambulance. (*Id.*) Noticing Mr. Struczul's approach, Sergeant Clemence intervened and instructed Mr. Struczul to return to the sidewalk and not interfere with the officers. (Pl.'s Resp. Ex. 2.) During the brief seconds that Officer Whipple and Sergeant Clemence were focused on Mr. Struczul, Mr. Salmo exited the ambulance, ran toward Mr. Rusu, and hit Mr. Rusu in the head with his elbow. (Defs.' Mot. Ex. 1.) The blow knocked Mr. Rusu to the ground, where he struck his head on the pavement and was rendered unconscious. (Pl.'s Resp. Ex. 1.) Police officers tackled and then arrested Mr. Salmo. (*Id.*; *see also* Pl.'s Resp. Ex. 2; Defs.' Mot. Ex. 1.) Mr. Rusu subsequently was taken to the hospital. Mr. Rusu claims he has suffered "severe and

---

[3] Defendants contend that Mr. Struczul began yelling at Officer Whipple. (Defs.' Br. at 2.) Mr. Rusu claims that Mr. Struczul was simply inquiring about the situation. (Pl.'s Resp. at 5.) Neither dashboard camera clearly shows Mr. Struczul, and neither camera picked up the full audio between Mr. Struczul and the officer. (Defs.' Mot. Ex. 1.)

permanent injuries including significant head trauma" as a result of Mr. Salmo's assault. (Pl.'s Compl. ¶ 9.) On April 10, 2006, Mr. Rusu filed the pending action against Defendants.

## III. Applicable Law and Analysis

To succeed on a Section 1983 claim, a plaintiff must demonstrate that the defendant was acting under color of state law and that the defendant's conduct deprived the claimant of rights, privileges, or immunities secured by the Constitution or laws of the United States. *Bennett v. City of Eastpointe*, 410 F.3d 810, 817 (6th Cir. 2005) (citing *McKnight v. Rees*, 88 F.3d 417, 419 (6th Cir. 1996)). As stated previously, at this time, Mr. Rusu asserts only that the individual Defendants violated his Fourteenth Amendment substantive due process rights. Defendants contend that the individual officers are entitled to qualified immunity. (Defs.' Br. at 2-4.)

This Court must employ a two-step test to determine whether Defendants are entitled to qualified immunity. *See Saucier v. Katz*, 533 U.S. 194, 121 S. Ct. 2151 (2001). First, viewing the facts in the light most favorable to Mr. Rusu, the Court must determine whether a constitutional violation occurred. *Solomon v. Auburn Hills Police Dep't*, 389 F.3d 167, 172 (6th Cir. 2004). Second, the Court must determine whether the violation involved a clearly established constitutional right. *Id.* As Defendants only argue that the first prong is not satisfied, the Court will focus its attention on the question of whether a constitutional violation occurred.

Mr. Rusu alleges that Defendants violated his substantive due process rights by

failing to protect him from Mr. Salmo, while he was in custody, when they knew that Mr. Salmo posed a known risk to Mr. Rusu. (Pl.'s Resp. Br. at 8). The Fourteenth Amendment provides that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. CONST. amend. XIV. Although the State has no general duty to protect individuals from private acts of violence, the federal courts have recognized two exceptions to this rule: the "special relationship" exception and the "state-created danger" exception. *See DeShaney v. Winnebago County Dept. of Social Services*, 489 U.S. 189, 199-200, 109 S.Ct. 998, 1005 (1989) (describing the "special relationship" exception); *McQueen v. Beecher Cmty. Sch.*, 433 F.3d 460, 464 (6th Cir. 2006) (recognizing a "state-created danger" exception); *see also Kallstrom v. City of Columbus*, 136 F.3d 1055 (6th Cir. 2003) (same). In their motion for summary judgment, Defendants assume that Mr. Rusu is relying on the first exception– an assumption Mr. Rusu did not correct and with which he appeared to agree in response. (Defs.' Br. at 5; Pl.'s Resp. Br. at 5-6.) During oral arguments, however, Mr. Rusu's counsel specifically argued that the applicable exception in this case is the "state-created danger" exception.

Regardless of which exception (if either) applies, in order to establish a constitutional violation, Mr. Rusu must show more than a causal connection between the state action and the private act of violence as "the due process guarantee does not entail a body of constitutional law imposing liability whenever someone cloaked with state authority causes harm." C*ounty of Sacramento v. Lewis*, 523 U.S. 833, 848, 118 S. Ct. 1708, 1717 (1998). "[T]he Fourteenth Amendment protects only against abuse of

executive power which ‘shocks the conscience.’” *Ewolski v. City of Brunswick*, 287 F.3d 492, 510 (6th Cir. 2002) (citing *Lewis*, 523 U.S. at 846, 118 S. Ct. at 1716).

The Sixth Circuit recently summarized the analysis for determining whether a state actor’s conduct violates the Fourteenth Amendment:

> [T]he plaintiff “must demonstrate that the state acted with the requisite culpability to establish a substantive due process violation under the Fourteenth Amendment.” The government’s conduct must be “so ‘egregious’ that it can be said to be ‘arbitrary in the constitutional sense,’” but the standard is “‘no calibrated yard stick.’” “The guiding principle seems to be that a deliberate-indifference standard is appropriate in ‘settings that provide the opportunity for reflection and unhurried judgments,’ but that a higher bar may be necessary when opportunities for reasoned deliberation are not present.”

*McQueen*, 433 F.3d at 469 (internal citations omitted); *see also Ewolski*, 287 F.3d at 510. In other words, the circumstances presented in the individual case determine whether the defendant’s conduct violated the Fourteenth Amendment. In circumstances “when unforseen circumstances demand an officer’s instant judgment,” such as a high-speed police chase,“a Fourteenth Amendment violation occurs only when the police act with malice and an ‘intent to harm.’” *Ewolski*, 287 F.3d at 511 (citing *Lewis*, 523 U.S. at 853-54, 118 S. Ct. at 1720 (internal citations omitted)). In comparison, where “actual deliberation is practical,” such as in the custodial situation of a prison, a less deferential “deliberate indifference” standard applies. *Lewis*, 523 U.S. at 851, 118 S. Ct. at 1719.

The parties disagree as to which standard applies in the instant case. Defendants argue that the situation presented did not provide the officers time for reflection and that,

therefore, the more deferential "intent to harm" standard applies. (Defs.' Br. at 6.) Mr. Rusu contends that in all custodial situations, such as his case, the less deferential "deliberate indifference" standard applies. (Pl.'s Resp. at 7 (citing *Stemler v. City of Florence*, 126 F.3d 856 (6th Cir. 1997).)

As Defendants correctly point out, *Stemler* was decided before the *Lewis* Court clarified that the circumstances presented dictate which standard to apply to evaluate the state actor's conduct. Thus the Court does not believe that the deliberate indifference standard always applies in custodial situations. The Court further believes that the incident with which the officers were presented on June 3, 2005, more closely resembles those situations in which officers are faced with "unforseen circumstances" that demand "instant judgment." *Lewis*, 523 U.S. at 853, 118 S. Ct. at 1720. Mr. Rusu therefore must show that the officers acted with malice and an intent to harm him when they did not arrest Mr. Salmo and walked Mr. Rusu, while he was handcuffed, within Mr. Salmo's proximity. *Ewolski*, 287 F.3d at 511 (citing *Lewis*, 523 U.S. at 853-54, 118 S. Ct. at 1720). Even accepting Mr. Rusu's version of the events as true, the Court concludes, as a matter of law, that this conduct did not violate Mr. Rusu's constitutional rights. The officers' actions evidence neither malice nor an intent to harm Mr. Rusu. Even applying the less deferential "deliberate indifference" standard, however, the Court does not find the officers' actions "conscience shocking."

The deliberate indifference standard "has been equated with subjective recklessness, and requires the § 1983 plaintiff to show that the state 'official knows of and

disregards an excessive risk to [the victim's] health or safety.'" *Ewolski*, 287 F.3d at 513 (citation omitted). Mr. Salmo did not pose a known and excessive risk of harm to Mr. Rusu by the time of his attack. Mr. Salmo's verbal threats ended approximately nine minutes before he actually attacked Mr. Rusu. (Pl.'s Resp. at 4-5 (providing that the last verbal threat occurred at 2:33:52 and that the assault occurred at 2:43:11.)) During this period of time, Mr. Salmo was in the ambulance being treated for his wound. There is no evidence that Mr. Salmo continued his agitated, threatening behavior during this interval. Additionally, it appears from the video footage of the incident, that at least one officer was standing directly outside the ambulance and at least three more people (officers or paramedics) were inside the ambulance while Mr. Salmo was being treated. (Defs.' Mot. Ex. 1.) Moreover, at the time of Mr. Salmo's attack, the officers were reacting to the more obvious and immediate threat that Mr. Struczul presented. (Pl.'s Resp. Ex. 2.) Thus the Court concludes that the officers were not deliberately indifferent to Mr. Rusu's safety.

For the above reasons, the Court concludes that the officers did not violate Mr. Rusu's Fourteenth Amendment rights. The Court therefore holds that Defendants are entitled to summary judgment with respect to Mr. Rusu's Section 1983 claim.

Accordingly,

**IT IS ORDERED,** that Defendants' motion for summary judgment is **GRANTED.**

s/PATRICK J. DUGGAN
UNITED STATES DISTRICT JUDGE

Copies to:
Stephen N. Leuchtman, Esq.
John Schalter, Esq.
Michael P. Salhaney, Esq.